**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DAWN R. ROBBINS,

                       Plaintiff,

             v.                                No. 5:14-CV-1534
                                                 (MAD/CFH)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

                       Defendant.
_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                            **OF COUNSEL:**

Legal Services of Central               CHRISTOPHER CADIN, ESQ.
   New York-Syracuse
Attorneys for Plaintiff
472 S. Salina St., Ste. 300
Syracuse, New York 13202

Social Security Administration        DAVID L. BROWN, ESQ.
Office of Regional General Counsel   Special Assistant U.S. Attorney
Region II
Attorneys for Defendant
26 Federal Plaza - Room 3904
New York, New York 10278

## REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff Dawn R. Robbins ("Plaintiff") brings this action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

_____

      [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

Robbins moves for a finding of disability, and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 13, 21. For the following reasons, it is recommended that the Commissioner's decision be remanded for further proceedings.

## I. Background

### A. Procedural History

On July 19, 2011, and August 5, 2011, plaintiff protectively filed applications for disability insurance benefits and supplemental security income pursuant to the Social Security Act and 42 U.S.C. § 401 et seq., claiming an alleged onset date of March 1, 2009. T. 143-51.[2] Both applications were denied on October 19, 2011. Id. at 77-81. Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ David S. Pang on December 5, 2012. Id. at 82-83; 31-74 (transcript of the hearing). In a decision dated May 10, 2013, the ALJ held that plaintiff was not entitled to disability benefits or supplemental security income. Id. at 17-30. Plaintiff's counsel filed a timely request for review with the Appeals Council, and on October 21, 2014, the request was denied, making the ALJ's findings the final decision of the Commissioner. Id. at 1-4, 12-13. This action followed.

### B. Facts

---

[2] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 9.

### 1. Plaintiff's Testimony[3]

Plaintiff testified that, prior to the hearing on December 5, 2012, the last time she worked for pay was in 2009, when she babysat her friend's children, ages ten and eight, during the workweek. T. 37-38. She stated that the frequency of this work would depend on her friend's school schedule, but she usually watched the children both before and after school. Id. at 38. This arrangement lasted for approximately six months. Id. Prior to this job, plaintiff worked at the Family Health Network from 2008 to 2009 as a front desk receptionist, performing filing, interacting with customers, performing data entry, and running errands. Id. at 39-40. After starting at the company as a receptionist, plaintiff eventually moved to the billing department where she performed data entry, handled customer billing issues, and stocked her office. Id. at 40. Plaintiff testified that she would sometimes need to lift boxes to move them from the basement to her office. Id. The boxes weighed approximately twenty to thirty pounds. Id. She was fired from this position following a one-week hospitalization and a subsequent one-week recovery period at home. Id. at 41.

Prior to her job at the Family Health Network, plaintiff worked at a grocery store as a barista. T. 41. In that position, she worked with customers, kept track of store inventory, stocked shelves, and set up displays. Id. She also previously worked as a waitress and bartender. Id. at 42.

Plaintiff testified at the hearing that she was "not cleared" to drive because she recently had surgery, and that her boyfriend had driven her to the hearing. T. 42-43. She last drove a vehicle one month prior to the hearing. Id. at 43. She indicated that she did not

---

[3] This section is a recitation of plaintiff's testimony and does not amount to findings of facts by this Court. See T. 33-60.

know when she would be able to drive again because she was on narcotics for pain management, and had medical issues with her right, dominant hand.  Id.

At the time of the hearing, plaintiff lived with her daughter, and her boyfriend also stayed at her home.  T. 43.  She stated that she cannot tend to her household's needs, and that her daughter helped around the house, but that her boyfriend "[did] the majority of everything."  Id. at 44.  Even before her surgery, she was unable to do any housework.  Id. Later in her testimony, she stated that she cooked and performed light housecleaning, but that her condition had progressively worsened over the past year.  Id. at 44-45.

On a typical day at home, plaintiff testified that she spent most of the day in bed, watched the television or accessed the internet, and that she usually fell asleep due to her medications.  T. 44.  She did not shower every day, especially at the time of her testimony, since it was more painful for her to shower since having surgery.  Id.

## 2. Medical Evidence[4]

### a. Syracuse Orthopedic Specialists

Plaintiff was first referred to Dr. Richard Zogby, M.D. on October 4, 2010 for a spinal surgical consultation.  T. 459-62.  At that appointment, plaintiff reported experiencing tension and a shooting pain on the right side of her neck, and into her right shoulder, in addition to numbness in her right thumb.  Id. at 459.  Plaintiff also denied suffering from anxiety and depression, but reported muscle pain and stiffness.  Id. at 460.  She further reported that her

---

[4]  The administrative record submitted by the Commissioner contains approximately 233 pages of medical records.  T. 232-464.  The medical evidence is summarized below only to the extent that such evidence is referenced in the parties' briefs.  See Dkt. Nos. 13, 21.  However, the Court has performed a thorough review of all medical evidence in the record.

neck, right shoulder, and right thumb issues had persisted for eighteen months, and she had been unable to attend school.  Id.  Physical therapy, injections, and medications provided little relief.  Id.  Her pain was located in the neck, radiating to the right trapezius, and described as constant with "high grade episodes."  Id.  The pain occurred with activity, and she reported stiffness lasting for more than an hour.  Id.

Dr. Zogby observed that plaintiff appeared to be in moderate pain, but she walked "with no apparent pain or difficulty."  T. 460.  Her spinal alignment was normal, with "moderate tenderness over the right paraspinal area and right trapezius."  Id. at 460-61.  Her range of motion was moderately limited in all directions, and Dr. Zogby observed that the plaintiff experienced pain when performing a right rotation.  Id. at 461.  Motor exams of both the left and right arms, and a sensory exam of the left arm were normal.  Id.  A sensory exam of the right arm was "diminished for the radial aspect of the forearm and thumb."  Id.

Dr. Zogby diagnosed plaintiff as suffering from a herniated cervical disk, cervical spondylosis, neck pain, and numbness.  T. 461.  Dr. Zogby noted that her symptoms were consistent with a herniated cervical disk, but that she was neurologically stable.  Id.  He discussed surgery as a treatment option, but plaintiff stated that would like to defer surgery. Id.  Instead, Dr. Zogby and plaintiff agreed on a treatment plan of an additional injection to see if plaintiff's condition improved.  Id.  If it did not, Dr. Zogby noted that plaintiff was a "good surgical candidate."  Id.  Plaintiff was told to return to Dr. Zogby for further evaluation at any time.  Id.  Dr. Zogby also noted her "Disability-Work-School Status" as "TOTAL DISABILITY."  Id.  He also noted that her MRI showed a "large right sided herniated disc at C5-6."  Id. at 462.

Plaintiff returned to Dr. Zogby on February 11, 2011, and reported increased

numbness in her right thumb, and neck pain radiating down her right arm.  T. 297.  Plaintiff reported that her condition was unchanged since her October 4, 2010 appointment, and that she was awaiting epidural injections from her pain management provider.  Id. at 298. Dr. Zogby noted that plaintiff appeared in moderate pain.  Id.  Dr. Zogby observed that plaintiff felt moderate tenderness over the right paraspinal area and right trapezius.  Id. at 299.  He further discussed the surgical option with plaintiff and suggested a follow-up visit in two months, after the administration of epidural injections.  Id.  He again noted her disability status as "total."  Id.

Plaintiff returned to Dr. Zogby for a follow-up visit on April 22, 2011.  T. 293.  She reported that she did not receive epidural injections because she had missed her consultation appointment, and that she was hesitant to receive the injections because of a prior bad experience.  Id.  She also stated that she had fallen about a month prior to the appointment, and exacerbated the pain in her neck for three to four days.  Id.  Plaintiff also reported that she would like to avoid further injections or surgical intervention, therefore Dr. Zogby advised that she continue taking her current medications and follow up with him in two months.  Id. at 295.

On June 23, 2011, plaintiff reported that her continued use of pain medication did not help her condition, and that she would like to explore treatment by injections.  T. 289.  She also reported increased numbness in her right thumb, and numbness in her right arm and second and third toes.  Id.  Dr. Zogby again noted tenderness over the paraspinal region and right trapezius, as well as a limited range of motion with pain upon right rotation.  Id. at 291.  Dr. Zogby also noted that her condition was stable, refilled her prescriptions, and advised that she return in three months for a follow-up.  Id.  He noted that plaintiff was totally

disabled.  Id.

On September 30, 2011, plaintiff returned for a follow-up appointment with Dr. Zogby, and reported the same symptoms, and that her pain was a four out of ten while she was taking her medications.  T. 412.  Dr. Zogby reported the same objective findings as her previous visit, and noted that her condition was unchanged.  Id. at 414.  He noted that he felt that she would benefit from surgery, but that she was still hesitant to consent to surgical intervention.  Id.  Dr. Zogby gave plaintiff a script for physical therapy and advised that she return in three months for a follow-up visit.  Id.

Plaintiff returned to Dr. Zogby on December 21, 2011, and reported the same symptoms as previous visits.  T. 416.  She also reported that twice-weekly physical therapy appointments helped her condition on the days that she received treatment.  Id.  She rated her current pain level as a six out of ten.  Id.  Again, Dr. Zogby noted that plaintiff appeared to be in a moderate amount of pain, and that she had a limited range of motion in all directions.  Id. at 417.  Dr. Zogby refilled her medications and continued her on physical therapy, but told her that he felt it would be beneficial for her to have another MRI.  Id. at 418.

Plaintiff had an MRI on January 5, 2012.  T. 404.  Dr. Zogby noted on the MRI that there was "[n]o interval change from [the] January 20, 2010 examination."  Id.  The findings of the MRI were that plaintiff suffered from a "[l]arge right paracentral disc protrusion . . . at C5-C6 . . . severely narrowing the right lateral recess and resulting in mild central canal stenosis."  Id.  Dr. Zogby further noted that "[r]eversal of normal cervical spine lordosis is once again seen possibly secondary to muscle spasm," and that the MRI showed mild osteoarthritic changes.  Id.  At plaintiff's follow-up appointment on January 11, 2012, plaintiff

reported her pain level as a six out of ten. Id. at 420. Plaintiff was examined by Helen

Harris, RPA-C, who discussed her medical options. Id. at 421. Harris told plaintiff that she

could try to manage her pain through medications, injections or surgery, and gave her

information regarding the surgery. Id. Plaintiff stated that, if she were to choose surgery,

she would wait until Dr. Zogby returned from his absence so that he could perform it. Id.

Plaintiff was seen by Harris again on February 23, 2012. T. 423. She reported her

pain level as a four out of ten that day. Id. at 424. Plaintiff reported that she was "happy"

with the results of her current medication regimen, and that she would like to wait for Dr.

Zogby to return to proceed with surgery. Id. at 425. Plaintiff also reported that she was

currently taking classes and her schedule was "tight." Id. Plaintiff saw Harris again on May

23, 2012, and reported that she prefers conservative care, and reiterated that she preferred

to postpone surgery until Dr. Zogby's return. Id. at 426-28. Harris noted that if plaintiff's

current treatment regimen made her "comfortable and functional" then she should continue

with it. Id. at 428. Harris also noted that if her pain increased, her treatment regimen should

be reevaluated. Id.

Plaintiff returned to Harris on July 11, 2012, reporting that her neck pain had

worsened. T. 429. Harris refilled her prescriptions and referred her to Dr. Zogby, as he had

returned from his absence. Id. at 431.

Craig Hanifin, RPA-C examined plaintiff on July 31, 2012. T. 432-34. Plaintiff

reported that she was considering surgery. Id. at 434. Hanifin planned to update her MRI

and discuss the findings with Dr. Zogby. Id.

Plaintiff was examined by Dr. Zogby on August 2, 2012. T. 435-38. She rated her

pain severity as a three out of ten, and stated that the pain is exacerbated when she sits. Id.

at 435. Dr. Zogby, who had been treating plaintiff for her cervical spine ailments, examined her lumbar spine for the first time. Id. at 436. Plaintiff reported that she had been experiencing chronic back pain that caused discomfort down her left leg, and numbness in her left big toe. Id. She also reported throbbing pain and stiffness in her lumbar spine area, radiating to the left leg, that occurs during activity and while sitting. Id. She further reported loss of her range of motion, morning stiffness lasting one hour or more, and numbness and weakness of the left leg and foot. Id. Upon examination of plaintiff's lumbar spine, Dr. Zogby noted that plaintiff appeared to be in moderate pain. Id. at 437. Palpation of the lumbar area revealed moderate tenderness over the left sciatic notch. Id. Plaintiff exhibited pain upon flexion, and her range of motion was reduced moderately in all directions. Id. She also exhibited a gait with a limp on her left leg. Id. A seated straight leg raise test was positive on the left side. Id. Dr. Zogby concluded that these symptoms suggested a herniated lumbar disc, and opined that physical therapy would be the best option to start a conservative treatment regimen. Id. He further stated that, if the physical therapy was unsuccessful, plaintiff should obtain an MRI of her lumbar spine. Id.

Plaintiff obtained an MRI of her cervical spine on August 10, 2012. T. 406. The MRI did not show any interval change in her condition as compared to the January 5, 2012 MRI. Id. At a follow-up appointment with Hanifin on August 17, 2012, plaintiff reported that her condition was "unchanged" since the last visit. Id. at 439-41. Hanifin noted that he "believe[d plaintiff] would benefit from a C5-6 ACDF,"[5] and that they were waiting for

---

[5] ACDF is an abbreviation for Anterior Cervical Diskectomy and Fusion. MEDILEXICON, http://www.medilexicon.com/medicalabbreviations.php?keywords=ACDF&search=abbreviation (last visited Mar. 1, 2016).

insurance authorization before proceeding with the surgery.  Id. at 441.

Plaintiff had an MRI performed on her lumbar spine on September 12, 2012.  T. 409.
The MRI showed "[m]inimal narrowings of lateral recesses at L3-L4, L4-L5 and L5-S1
secondary to osteoarthritic changes."  Id.  She returned to Dr. Zogby on September 21,
2012 for a review of her lumbar spine MRI.  Id. at 442.  She reported feeling leg cramping at
night, moderate low back pain, and a "shifting and grinding sensation in her lower back."  Id.
She also reported that physical therapy had aggravated her back.  Id.  Dr. Zogby reviewed
her lumbar spine MRI and stated that it showed "early degenerative changes but nothing
acute."  Id. at 444.  He also noted that they planned to proceed with plaintiff's cervical spine
surgery, and that if her symptoms persisted, he suggested a nerve conduction study.  Id.
Plaintiff also received a Depo-Medrol injection at this visit, and received two more injections
over the next two weeks.  Id. at 445-47.

Dr. Zogby examined plaintiff prior to surgery on November 7, 2012.  T. 449-51.  He
performed an anterior cervical diskectomy and decompression at plaintiff's C5-6 vertebrae,
along with an anterior interbody fusion at the C5-6 vertebrae with NuVasive interbody
implant and grafting on November 14, 2012.  Id. at 457-58.


### i. Physical Evaluation - Syracuse Orthopedic Specialists

Dr. Wulff, M.D. prepared a physical evaluation detailing plaintiff's physical limitations.
T. 463-64.  Although the physical evaluation was sent to Dr. Zogby, Dr. Wulff noted that the

form was completed "for Zogby." Id. at 464. The evaluation is undated.[6] Id.

Dr. Wulff noted that plaintiff's symptoms included moderate to severe neck pain, moderate right shoulder and arm pain, difficulty swallowing, right thumb numbness, right upper extremity radicular symptoms, headaches, and cervical spine pain and stiffness. T. 463. Dr. Wulff diagnosed plaintiff as suffering from a herniated cervical disk, cervical spondylosis, neck pain, and numbness. Id. Her prognosis was fair. Id.

As to plaintiff's specific medical impairment of her cervical spine, which effected her right arm and hand, Dr. Wulff opined that plaintiff would be unable, during an eight hour workday, to type or write effectively, use her hand for grasping and using tools, use her hand for fine manipulation, or use her hand for shaping, smoothing, building, or feeling textures. T. 463. Dr. Wulff cited plaintiff's right hand and upper extremity pain and stiffness as the reasons for these limitations. Id. Dr. Wulff further opined that, due to plaintiff's limited range of motion, she would be unable to perform, or limited in performing lifting; carrying; pushing; pulling; and reaching out in all directions, because these movements would intensify her pain. Id. at 463-64. She would also be unable to perform work activity with her hands at a productive pace, because she had "limited to no use of [her] right upper extremity due to increased pain and numbness." Id. at 464.

As to maintaining attendance and punctuality in a job setting, Dr. Wulff opined that plaintiff would not be able to be punctual and function at her job because of her pain, and

---

[6] Although the physical evaluation submitted by Dr. Wulff is undated, the Court assumes that it postdates the hearing before the ALJ. The transcript of the hearing indicates that as of the date of the hearing, plaintiff had not been able to obtain an evaluation from Dr. Zogby because he had taken a medical leave of absence from his practice. T. 34. Plaintiff's representative stated at the beginning of the hearing that she had contacted Syracuse Orthopedic Specialists to have another doctor in the practice review the case and complete the evaluation. Id. The Court assumes that Dr. Wulff's evaluation resulted from that request.

the side effects caused by her pain medication.  T. 464.  Dr. Wulff stated that plaintiff is

severely limited in her abilities, and has not been able to work since January 2011.  Id.


### b.  Cortland Regional Medical Center Physical Therapy - Justine E. Lieb, P.T.

Plaintiff was first evaluated for physical therapy treatment by Justine E. Lieb, P.T., on

November 3, 2011.  T. 353-58.  She reported to Lieb that she had injured her back

sometime in 2009 after "sleeping wrong at night."  Id. at 355.  She underwent physical

therapy in 2009 with some success, but was still experiencing problems.  Id.  She stated that

she experienced numbness and a tingling sensation in her right thumb.  Id.  She rated her

pain level as a three out of ten at rest, and a ten out of ten when she lifts objects, raises her

arms above her head, and turns her head.  Id.  The pain was exacerbated with repetitive

motions and stress.  Id.  Her pain level improved when she took medications, relaxed, and

applied heat to the affected area.  Id.

Lieb noted that plaintiff had a slouched posture, rounded shoulders, and a forward

head tilt.  T. 355.  Plaintiff experienced tenderness upon palpation, more so on the right side

than the left.  Id.  She had a full upper extremity range of motion, with tenderness while

performing a full range of motion.  Id.  She could rotate to the left up to 75 degrees, and to

the right up to 45 degrees.  Id.  Her physical therapy goals included decreased pain and

increased functional mobility.  Id. at 356.

During plaintiff's physical therapy appointment on November 7, 2011, plaintiff

reported that her neck had been "pretty sore" over the weekend, and that she had run out of

her medication.  T. 371.  She tolerated the physical therapy movements well.  Id.

On November 15, 2011, plaintiff reported that she had felt better after the previous

appointment, but that she was currently feeling stressed, and the stress was not helping her condition.  T. 370.  She responded "good" to an electronic stimulation treatment.  Id.  She tolerated a massage well.  Id.  On November 17, 2011, plaintiff reported that her neck was feeling "a little better," and tolerated her exercises well.  Id. at 368.

On November 21, 2011, plaintiff reported again that her neck was feeling "a little better."  T. 366.  She tolerated her exercises and electronic stimulation well.  Id.  On November 29, 2011, plaintiff reported that she had driven to Georgia and her neck was "pretty sore."  Id. at 364.  She again tolerated her exercises and electronic stimulation well.  Id.

On December 1, 2011, plaintiff reported that her neck was "a little better today."  T. 362.  She again tolerated the exercises well.  Id.  On December 6, 2011, plaintiff stated that she "feel[s] great" after leaving the physical therapy sessions.  Id. at 360.  At this appointment, she tolerated electronic stimulation and her exercises well.  Id.

On January 10, 2012, Lieb issued a summary of plaintiff's physical therapy sessions.  T. 350-51.  The evaluation stated that plaintiff felt that the physical therapy sessions helped her condition, and that her level of pain was reduced to a three or four out of ten, from a seven or eight out of ten.  Id. at 350.  Plaintiff also stated that she planned to continue performing exercises on her own because she was hesitant to have surgery performed on her back.  Id.  The physical therapist recommended that she continue with the exercises.  Id.

On August 20, 2012, plaintiff returned to Lieb for a physical therapy evaluation.  T. 377-79.  At the evaluation, plaintiff reported that, three months prior to the evaluation, she began experiencing low back pain on her left side, and numbness and tingling in her left great toe.  Id. at 377.  The pain started gradually, and she rated her pain level as a three out

of ten.  Id.  The pain worsened "with prolonged sitting, bending, doing dishes, getting [out of bed] in the [morning], and prolonged walking."  Id.

Upon examination, Lieb found that plaintiff exhibited a slouched sitting posture, forward head tilt, rounded shoulders, and a posterior pelvic tilt.  T. 377.  Her right side paraspinal region was tender upon palpation.  Id.  She also experienced increased pain with certain movements used to test her strength and range of motion.  Id.  After assessing her condition, the physical therapist prepared a treatment plan for twice weekly visits for an eight week duration.  Id. at 375.

On August 22, 2012, plaintiff reported to Lieb that her back was still sore and there was no change in the numbness and tingling that she was experiencing.  T. 383.  Lieb performed electronic stimulation on her lumbar region, along with a massage.  Id.  Plaintiff tolerated both procedures well.  Id.  On September 4, 2012, plaintiff reported that she was experiencing increased pain in her lower back.  Id. at 382.  She was unsure what had triggered the pain, but reported that she went to the beach over the weekend and that the walking on the beach "killed her."  Id.  Plaintiff's doctor recommended that she discontinue physical therapy for the time being, and Lieb discharged her.  Id.

### c.  Dr. Sandra Boehlert, M.D.

Dr. Boehlert performed an internal medicine examination of plaintiff on October 1, 2011.  T. 313-16.  At this examination, plaintiff reported that she was diagnosed with a cervical disk herniation two years prior, and that physical therapy to treat her condition had been unsuccessful.  Id. at 313.  She was currently taking pain medications, which helped her condition.  Id.  She expressed hesitancy to proceed with surgery recommended by her

-14-

doctor because she thought that her condition was slowly improving. Id. She also reported that she avoids reaching over her head, and cannot lift more than ten pounds. Id. She stated that her pain radiates down her right arm, and that her right thumb is numb. Id.

Plaintiff reported that she cooked daily, and performed light housework three to four times per week. T. 314. She stated that her ability to perform housework was limited by the ten pound weight restriction. Id. She did laundry three to four times per week, light shopping once per week, showered daily, and dressed daily. Id. She watched the television, listened to the radio, reads, attended college classes, and socialized with friends. Id.

Upon examination, Dr. Boehlert noted that plaintiff appeared in no acute distress. T. 314. As to Dr. Boehlert's examination of plaintiff's muscoloskeletal system, Dr. Boehlert noted:

> Cervical spine shows flexion, extension limited to 40 degrees, rotation to the right limited to 75 degrees, full rotation to the left. Lateral flexion limited to 40 degrees bilaterally. There is tenderness in the cervical spine in the paraspinal muscles on the right. No scoliosis, kyphosis, or abnormality in the thoracic spine. Lumbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. [Straight leg raise] negative bilaterally. Full [range of motion] of shoulders, elbows, forearms, and wrists bilaterally. Full [range of motion] of hips, knees, and ankles bilaterally. No evident subluxations, contractures, ankylosis, or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion.

Id. at 315.

As to plaintiff's neurologic system, Dr. Boehlert noted that plaintiff had a sensory deficit in her right thumb. T. 315. As to motor activity of plaintiff's hands, Dr. Boehlert noted that plaintiff's hand and finger dexterity were intact, and her grip strength was a 5/5. She

-15-

again noted that plaintiff had a sensory deficit in her right thumb.  Id.

Dr. Boehlert offered the following Medical Source Statement:

> Mild-to-moderate limitation to repetitive rotation of the cervical spine or heavy lifting with the right arm or repetitive overhead reach with the right arm and exertion repetitively with the right hand.  Mild limitation to fine motor activity of the right hand.

T. 315-16.


### d.  Karen L. Wickert, FNP

Plaintiff was examined by Wickert on December 9, 2011 and reported joint pain, numbness in her hand, and "stingers" in her right arm.  T. 400.  She stated that she had a herniated disk and neck pain.  Id.  She resumed physical therapy and received spinal injections, but they did not help her pain.  Id.  She further reported that she could not lift her arms over her head, or more than 90 degrees.  Id.  She could not perform most of her activities of daily living, or lift more than ten pounds.  Id.  She also reported some sleep disturbance.  Id.  She stated that she was in "constant pain," but taking Vicodin provided some relief.  Id.  As to plaintiff's spine disorder, Wickert noted that plaintiff was "medically unable to work at present" and that plaintiff was seeing Dr. Zogby for follow-up treatment. Id. at 401.  Plaintiff saw Wickert again on January 9, 2012, and Wickert noted that Dr. Zogby would follow-up with plaintiff regarding her recent MRI.  Id. at 398.

On April 24, 2012, plaintiff reported that her left foot was feeling numb and tingly.  T. 396.  She reported a herniated disc, joint pain and muscle pain.  Id.  Wickert directed plaintiff to have an x-ray and return to Dr. Zogby for evaluation.  Id. at 397.

Plaintiff saw Wickert on May 8, 2012, reporting GERD issues.  T. 394.  She saw

Wickert again on June 19, 2012 for allergy symptoms.  Id. at 392.

On August 9, 2012, plaintiff reported to Wickert that she was suffering from anxiety, along with leg cramps.  T. 390.  Plaintiff stated that she had difficulty falling asleep and staying asleep.  Id.  She also denied feeling depressed.  Id.  Wickert prescribed Klonopin. Id. at 391.  Wickert refilled plaintiff's Klonopin prescription on September 20, 2012, and noted that Dr. Zogby would be performing her neck surgery.  Id. at 387.  On September 27, 2012, plaintiff saw Wickert for a follow-up appointment regarding her asthma, and reported that she was receiving steroid injections in her back.  Id. at 385.

## II.  Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "'more than a mere scintilla,'" meaning that in the record one can find "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute

its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g); see Halloran, 362 F.3d at 31.

### B.  Determination of Disability

"Every individual who is under a disability. . . shall be entitled to a disability. . . benefit . . . ."  42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)) (additional citation omitted).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is

currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).


## C. ALJ Pang's Findings

Plaintiff, represented by a non-attorney representative, testified at the hearing held on December 5, 2012. T. 31-74. Using the five-step sequential evaluation, ALJ David S. Pang found that plaintiff (1) had not engaged in substantial gainful activity since March 1, 2009, the alleged onset date; (2) had the following severe medically-determinable impairments: degenerative disc disease, obesity, disc herniations, asthma, and degenerative joint disease; (3) did not have an impairment, alone or in combination, sufficient to meet the listed

-19-

impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintained

> the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she requires the ability to alternate standing and sitting every 30 minutes, but would not be off task when changing positions.  She cannot perform any overhead reaching with the right upper extremity.  She can frequently handle and finger with the right upper extremity.  She has no left upper extremity limitation.  She cannot climb ladders, ropes or scaffolds and can occasionally climb ramps and stairs, as well as occasionally stoop, kneel, crouch and crawl.  She can only have occasional exposure to dusts, fumes, and gases.  She cannot operation [sic] motor vehicle and can only occasionally use moving machinery.  She is limited to simple work.

and, thus; (5) given her age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy.  Id. at 17-25.

### D.  Plaintiff's Contentions

Plaintiff contends that the ALJ erred by (1) failing to account for plaintiff's anxiety, depression, and pain in determining that plaintiff's conditions were not severe; (2) failing to consider the combined effects of plaintiff's impairments; (3) improperly assessing plaintiff's credibility; (4) failing to adequately develop the record;[7] and (5) improperly relying on the testimony of the vocational expert at step five of the sequential evaluation.  Dkt. No. 13 at 11-22.

---

[7]  Plaintiff did not explicitly outline this argument in the table of contents of her brief, however, the argument is found in the section of plaintiff's brief where she argues that the ALJ improperly assessed her credibility.  See Dkt. No. 13 at 17-18.

## 1. RFC

The ALJ determined that plaintiff retained the RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she requires the ability to alternate standing and sitting every 30 minutes, but would not be off task when changing positions. She cannot perform any overhead reaching with the right upper extremity. She can frequently handle and finger with the right upper extremity. She has no left upper extremity limitation. She cannot climb ladders, ropes or scaffolds and can occasionally climb ramps and stairs, as well as occasionally stoop, kneel, crouch and crawl. She can only have occasional exposure to dusts, fumes, and gases. She cannot operation [sic] motor vehicle and can only occasionally use moving machinery. She is limited to simple work.

T. 21. In reaching this assessment, the ALJ discussed the notes and opinions of Drs. Wulff, M.D., and Boehlert, M.D.; as well as the opinion of Karen Wickert, FNP. Id. at 23.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150 (citations omitted). RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960. The Second Circuit has clarified that, in step five of the Commissioner's analysis, once RFC has been determined, "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

### a. Step Two Determination

Plaintiff argues that the ALJ erred at step two of the sequential analysis in finding that plaintiff's anxiety and depression were not severe impairments.[8] Dkt. No. 13 at 11-14. Defendant contends that the ALJ's step two determination was proper because substantial evidence supports the ALJ's determination. Dkt. No. 21 at 7-6. Further, defendant contends that any error at step two is harmless because the ALJ continued the sequential evaluation and accounted for plaintiff's mental limitations in the RFC assessment. Id. at 6.

At step two of the sequential evaluation process, the ALJ must determine the existence and severity of plaintiff's impairments. Oakley v. Colvin, No. 3:13-cv-679 (GLS/ESH), 2015 WL 1097388, at *3 (N.D.N.Y. Mar. 11, 2015); 20 C.F.R. §§ 404.1508, 416.908 ("[The] impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. An impairment is considered "not severe" if the medical evidence shows only a "slight abnormality" having "no more than a minimal effect on an individual's ability to work." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (S.S.A. 1985) (additional citation omitted). The threshold severity test is

---

[8] Plaintiff further argues that the ALJ erred by not finding plaintiff's pain to be a severe impairment. Dkt. No. 13 at 18-19. Defendant argues that pain itself is not an impairment. Dkt. No. 21 at 9. Defendant is correct. "[I]n and of itself, pain is not an impairment . . ." Charlton v. Comm'r of Social Sec., No. 08-CV-142 (DRH), 2009 WL 838118, at *15 (N.D.N.Y. Mar. 26, 2009). Therefore, the ALJ did not commit error in failing to find that plaintiff's pain is a severe impairment.

considered a "*de minimus* screening device to eliminate frivolous claims." Id. (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995)).

When considering the severity of a mental impairment, the ALJ must apply a "special technique" at steps two and three of his or her assessment. Oakley, 2015 WL 1097388, at *4; 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e). The special technique identifies four broad functional areas, including "(1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The first three functional areas are rated on a scale of "[n]one, mild, moderate, marked, and extreme." Id. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth area is rated on a scale of "[n]one, one or two, three, four or more." Id. Where the degree of limitation in the first three areas is "mild" or better, and the plaintiff has not experienced episodes of decompensation, the reviewing authority will generally find that the plaintiff's mental impairment is not severe. Sipe v. Astrue, 873 F. Supp. 2d 471, 479 (N.D.N.Y. 2012) (citing Kohler v. Astrue, 546 F.3d 260, 266 (2d Cir. 2008)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form ("Review Form")." Id.

Here, no Review Form was included in plaintiff's medical record. Plaintiff's alleged anxiety and depression were mentioned briefly in a small portion of her total record. Plaintiff's medical records from Family Health Network of Central New York, Inc. ("Family Health") indicate that plaintiff was first assessed as exhibiting anxiety and depression symptoms on November 24, 2009. T. 331. On December 8, 2009, plaintiff reported to Wickert that she was feeling less anxious. Id. at 329. Although "anxiety disorder" and "depression" are both listed as an active problem in plaintiff's medical record summary from

Family Health, the notes indicate an onset date of December 8, 2009, but contain no follow-up appointments after that date regarding plaintiff's anxiety or depression.  Id. at 317.  In August 2012, plaintiff reported that she was suffering from anxiety.  Id. at 390.  Wickert prescribed Klonopin and refilled that prescription once in September 2012.  Id. at 387.

ALJ Pang's analysis of plaintiff's alleged mental impairments does not rigidly follow the "special technique" described above, as he failed to explicitly rate plaintiff's functional areas.  See T. 20.  However, "[c]ourts conducting judicial review in social security cases . . . do not require perfect opinions or rigid, mechanical, formulaic applications of administratively-prescribed evaluative protocols."  Showers v. Colvin, No. 3:13-cv-1147 (GLS/ESH), 2015 WL 1383819, at *6 (N.D.N.Y. Mar. 25, 2015) (citing Cichocki v. Astrue, 729 F.3d 172, 177-78 (2d Cir. 2013)).  Plaintiff's record is sparse in regards to medical evidence regarding her alleged mental impairments.  Her records do not contain an opinion from any medical source regarding limitations caused by her alleged mental health disorders, nor does the record contain many statements from plaintiff herself regarding mental health symptoms.  The existence of a severe impairment is determined on a "strictly medical basis" and the plaintiff bears the burden of proving that they suffer from a severe impairment.  Bowen v. Yuckert, 482 U.S. 137, 153 n.8 (1987) (citation omitted).  The ALJ may read the medical record for what it says, and also what it does not say.  Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).  Plaintiff urges the Court to find her anxiety and depression severe, but presents no clinical evidence to allow the Court to reach such a conclusion.  Based on the record before this Court, plaintiff did not meet her burden of showing that she suffered from a severe mental impairment and the ALJ did not err in finding her anxiety and depression non-severe.

Further, because the ALJ found that plaintiff suffered from other severe impairments at step two, he continued the five-step sequential evaluation process, in which he considered all of plaintiff's impairments. T. 21-24. Therefore, even if the ALJ had failed to find her mental impairments severe, such error is harmless. Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (finding no error where the ALJ considered the plaintiff's anxiety and panic attacks at subsequent steps); Stanton v. Astrue, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding no error where the ALJ identified severe impairments at step two and continued the sequential analysis).

Accordingly, it is recommended that the Commissioner's decision on this ground be affirmed.

### b. Weight to Give Treating Physician/Failure to Develop Record

Plaintiff contends that the ALJ failed to fully develop the record by failing to re-contact plaintiff's treating physician, Dr. Wulff, after identifying perceived inconsistencies within his assessment of plaintiff's condition. Dkt. No. 13 at 18-19.

A treating physician's opinion on the nature and severity of a claimant's impairments will be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); Halloran, 362 F.3d at 32. "Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions of other medical records, 'not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician.'" Flagg v. Astrue, No. 11-CV-00458 (LEK), 2012 WL 3886202, at *10 (N.D.N.Y. Sept. 6, 2012) (quoting

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)).  If substantial evidence in the record

conflicts with the opinion of the treating physician, this opinion will not be deemed controlling

or conclusive, and "the less consistent the opinion is with the record as a whole, the less

weight it will be given."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (citation omitted).

Moreover, as the ultimate conclusion whether a claimant is disabled and cannot work is

reserved to the Commissioner (20 § C.F.R. 404.1527(e)(1)), "[a] treating physician's

statement that the claimant is disabled cannot itself be determinative."  Snell, 177 F.3d at

133.

Should the ALJ decline to give controlling weight to a treating physician, he or she

"must consider various 'factors' in deciding how much weight to give the opinion."  Petrie v.

Astrue, 412 F. App'x 401 (summary order) (2d. Cir. 2011) (citations omitted).  The ALJ

considers: "(i) the frequency of examination and the length, nature, and extent of the

treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

other relevant factors."  Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see 20 CFR §

404.1527(c)(2).  Where the ALJ rejects the treating physician's opinions or otherwise

determines that they are not controlling, she must set forth her reasoning with specificity.  20

C.F.R. §§ 404.1527(c)(2); see, e.g., Doyle v. Apfel, 105 F. Supp. 2d 115, 119 (E.D.N.Y.

2000).  An ALJ's "[f]ailure to provide [explicit] good reasons for not crediting a treating

source's opinion is ground for remand."  McClaney v. Astrue, No. 10-CV-5421 (JG)(JO),

2012 WL 3777413, at *16 (E.D.N.Y. Aug. 10, 2012) (quoting Snell, 177 F.3d at 134).

However, "'where the evidence of record permits [the court] to glean the rationale of an

ALJ's decision,'" the ALJ need not "'have mentioned every item of testimony presented to

him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" Petrie, 412 F. App'x at 407 (quoting Mongeur, 722 F.2d at 1040) (citation omitted). Ultimately, the final determination of disability and a claimant's ability to work rests with the Commissioner. See 20 C.F.R. § 404.1527(e) (2005).

The treating physician's rule goes "hand in hand" with the ALJ's duty to develop the record. Batista v. Barnhart, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). It is well settled that an ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even where the claimant is represented by counsel. See 20 C.F.R. § 404.1512(e) (explaining that the Commissioner will attempt to retrieve the entire medical history from the claimant's treating sources rather than always seek consultative examinations); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) ("[T]he lack of specific clinical findings in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion . . . . [E]ven if the clinical findings were inadequate, it [is] the ALJ's duty to seek additional information from [the treating physician] sua sponte.") (internal citation omitted). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." Shrock v. Colvin, 12-CV-1898 (MAD/CFH), 2014 WL 2779024, at *9 (N.D.N.Y. June 19, 2014) (quoting Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted)); Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative

record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted)); see also Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (stating that where a "'medical record paints an incomplete picture of [the claimant's] overall health during the relevant period, [as] it includes evidence of the problems . . . the ALJ had an affirmative duty to supplement [the] medical record, to the extent it was incomplete, before rejecting [the claimant's] petition . . . .'") (quoting Webb, 433 F.3d at 687).

Here, the ALJ assigned "some weight" to the opinion of Dr. Boehlert, because it was based on Dr. Boehlert's personal examination of plaintiff, and it was consistent with plaintiff's reported activities of daily living. T. 23. The ALJ gave "little weight" to Wickert's statement that plaintiff was disabled, and the statements from the medical records of Syracuse Orthopedic Specialties which list plaintiff's condition as "totally disabled." Id. Dr. Wulff's opinion, which was completed for Dr. Zogby, received "little weight" because the ALJ found that the restrictions set forth in the opinion were contradicted by plaintiff's reported activities of daily living. Id. The ALJ further opined that, because Dr. Wulff's opinion was rendered less than a month after plaintiff's surgery, the restrictions he assigned to plaintiff's condition "would be of a short-term duration, as she recovers from surgery." Id.

The Second Circuit has stated that it does "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 32. Here, the ALJ afforded little weight to Dr. Wulff's opinion for two reasons. First, the ALJ found that Dr. Wulff's opinion was contradicted by plaintiff's reported

activities of daily living. T. 23. Second, the ALJ opined that, because Dr. Wulff's opinion was rendered less than a month after plaintiff's surgery, the restrictions would be only of a limited duration, as she recovers from surgery. Id. The ALJ's rejection of Dr. Wulff's opinion is problematic for two reasons.

First, it is well-established that a treating physician's medical opinion is controlling unless it is contradicted by substantial evidence in the record. Snell, 177 F.3d at 134. Here, the ALJ cited heavily to Dr. Boehlert's one-time examination in determining plaintiff's right upper extremity and back limitations caused by her cervical spine issues.[9] T. 22. While Dr. Boehlert assigned only mild to moderate limitations regarding repetitive rotation of plaintiff's cervical spine, heavy lifting while using the right arm and reaching with the right arm, the ALJ seemingly ignored and failed to discuss the robust medical records from Syracuse Orthopedic Specialists which detail plaintiff's two-year treatment regimen for cervical spine and right upper extremity pain. See T. 289-300, 315-16, 402-64.

The record does not contain substantial evidence sufficient to overcome the weight normally afforded to a treating physician because the treating physician's records here are consistent with Dr. Wulff's opinion.[10] See Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)

---

[9] The Court further notes that Dr. Boehlert's report does not indicate that she reviewed any of plaintiff's medical records. T. 313-16.

[10] The Court recognizes that there is no evidence in the record indicating that Dr. Wulff examined plaintiff. The hearing transcript clarifies that Dr. Wulff completed plaintiff's evaluation because Dr. Zogby had taken a medical leave of absence from Syracuse Orthopedic Specialists. T. 34. Although the caselaw in this Circuit indicates that written reports of non-examining sources are entitled to little weight, Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990), this case is readily distinguishable, as Dr. Wulff is not a medical advisor, whose purpose was to explain plaintiff's medical records in terms understandable to lay examiners, nor is he a consultative examiner employed by the Social Security Administration. See id. (explaining that a non-examining medical adviser's opinion was entitled to little weight). Dr. Wulff is an orthopedic physician practicing in the same facility as Dr. Zogby. Because he practices with Dr. Zogby, his opinion should have alerted the ALJ to the inconsistencies between the ALJ's RFC assessment and the opinion of a treating source. See Crysler v. Astrue, 563 F. Supp. 2d 418, 433 (N.D.N.Y. 2008) (remanding where the ALJ afforded

(remanding the case where the record failed to show contradictory evidence needed to override the treating physician's opinion). Plaintiff's medical record from Syracuse Orthopedic Specialists shows that spinal injections and physical therapy failed to cure her pain and numbness. See, e.g., T. 413, 418. At her first visit with Dr. Zogby, he noted that she may need surgery if her condition remained unchanged or worsened. Id. at 461. At that visit, Dr. Zogby also noted that plaintiff appeared to be in moderate pain, exhibited a moderate limitation in her range of motion, experienced pain when rotating to the right, and showed diminished sensation of right arm for the radial aspect of the forearm and thumb. Id. at 460-61. Plaintiff's subsequent notes to Dr. Zogby showed no improvement in her condition despite spinal injections and physical therapy. See section I.B.2.a supra. Dr. Wulff's assessment specifically contemplates her "moderate to severe neck pain with moderate right shoulder/arm pain" as well as her right thumb numbness and "right upper extremity radicular symptom." T. 463. He concluded that she has not been able to work since January 2011, and that "she remains severely limited." Id. at 464. Dr. Zogby's medical records of his examinations of plaintiff, and Dr. Wulff's assessment clearly contradict Dr. Boehlert's assessment of plaintiff. See Shaw, 221 F.3d at 134. Therefore, Dr. Wulff's assessment is supported by the weight of the evidence and the ALJ erred in affording it little weight.

Second, where the ALJ identifies perceived inconsistencies in a treating physician's report, the ALJ has a duty to re-contact the treating physician and seek out more information. Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998). Here, the ALJ

only minimal weight to the opinion of a nurse practitioner who practiced with the plaintiff's treating physician, even though the ALJ's RFC assessment was significantly at odds with the nurse practitioner's MSS).

inexplicably discounts Dr. Wulff's opinion because it was rendered soon after plaintiff's surgery, despite the fact that the assessment clearly indicates that the stated limitations encompass the time period from January 2011 until December 2012, without reaching the merits of Dr. Wulff's opinion.  T. 23, 463-64; see McKissick v. Barnhart, No. 01 CV 1550(JG), 2002 WL 31409933, at *12 (E.D.N.Y. Sept. 30, 2002) (remanding where the ALJ dismissed a treating source's conclusions because the physician prepared the assessment two months after the plaintiff's ankle surgery).  The ALJ's assumption that the limitations set forth in Dr. Wulff's assessment were of limited duration was improper, as it is well-established that an ALJ may not substitute his or her own judgment in place of a competent medical opinion.  Rosa, 168 F.3d at 79 (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).  Further, because the ALJ clearly assessed Dr. Wulff's opinion as inconsistent with the other evidence in the record, he should have re-contacted Dr. Wulff to clarify those inconsistencies.  See Hartnett, 21 F. Supp. 2d at 221.

Accordingly, it is recommended that this matter be remanded, and that the ALJ be directed to obtain an updated MSS from Dr. Wulff, or Dr. Zogby.


### c.  Plaintiff's Credibility

Plaintiff argues that the ALJ erred by not crediting her testimony.  Dkt. No. 13 at 20-24.  Because the Court concludes that the ALJ did not fully develop the record, and failed to properly apply the treating physician rule, the Court need not address this contention, as the credibility determination may change on remand.  However, to the extent that the ALJ, on remand, reassesses the evidence after requesting an updated MSS from Dr. Wulff or Dr. Zogby, and applying the treating physician rule, the ALJ is directed to consider whether the

reevaluation necessitates a new credibility determination in light of the evidence as a whole.

### d. Step Five Determination

Plaintiff argues that the ALJ's step five determination is erroneous.  Dkt. No. 13 at 24-27.  As the Court is remanding to the ALJ for a new assessment of plaintiff's RFC, the Court need not address this contention.  Upon remand, if determined to be necessary, the ALJ is to reconsider the step five determination, and, if necessary, obtain further testimony from a vocational expert.

### III.  Conclusion

**WHEREFORE, IT IS HEREBY**

**RECOMMENDED**, that defendant's Motion for Judgment on the Pleadings (Dkt. No. 21) be **DENIED**; and it is further,

**RECOMMENDED** that plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 13) be **GRANTED** insofar as the decision of the ALJ be **REVERSED** and this matter **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the above decision; and it is further

**ORDERED**, that the Clerk of the Court is serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

DATED:       March 3, 2016
             Albany, New York

Christian F. Hummel
U.S. Magistrate Judge